Van Voorhis, J.
Raybrook Textile Corporation (hereinafter described as “ Raybrook ”) and Nathan Sheinman served written notice dated July 22, 1949, upon Brookside Mills, Inc. (hereinafter described as Brookside), Julius A. Krug and Thomas Epstein of “ Intention to Arbitrate ” three numbered questions stated to have arisen under the provisions of a contract dated April 16, 1948. In order to understand what is sought to be arbitrated, and whether or to what extent such arbitration should be stayed, it is necessary to carry in mind the material provisions of this contract. It was a tripartite engagement, entered into separately by Sheinman, Krug and Epstein, and Brookside. It provided for the advancement by Sheinman of $750,000 to Krug and Epstein individually, to secure the repayment of which in three years from April 16, 1948, with interest at 4%, they pledged 4,183 shares of common stock of Brookside. This was slightly over 50% of the outstanding common stock of that corporation, and belonged to Krug and Epstein, who owned all of the common stock except 100 shares. Brookside was not interested in the loan. Neither Krug, Epstein nor Brookside became personally liable to repay this money but, if it were not repaid with interest by April 16,1951, Sheinman had the right to cause said 4,183 shares of Brookside to be sold at public sale, at which he might be the" purchaser. Sheinman was given an option, which expired October 16, 1948, to acquire 50% of the common stock of Brook-side from Krug and Epstein at a price determinable from the *360 contract, which is stated in Epstein’s affidavit to have been approximately $1,700,000.
Brookside employed Sheinman under this contract “ as sole selling agent for the output of its Mill located in Knoxville, Tennessee, with the duty and right to style or direct the styling of its merchandise.” The contract further provided: “ Such engagement shall also include general supervision of the manufacturing operations of the mill. For the performance of all the said functions, Sheinman shall receive from Brookside as his entire compensation and expenses 3% on the net sales, less discounts, returns and allowances, of greige goods, and 5% on the net sales * * * of finished goods of Brookside,” described as his base compensation, and an additional 20% of the excess of the net profits of Brookside over $1,000,000 during each and any fiscal year. These provisions were offset by a proviso that if such net profits should be less than $600,000, there should be deducted from Sheinman’s base compensation a sum equal to one half of the deficiency, provided that Sheinman’s base compensation should not thereby be reduced below his actual cost of performing these functions ,for which he was engaged. It is evidently true that Sheinman agreed to advance this money to Krug and Epstein in anticipation of making substantial profits under his selling agency from Brookside. Krug and Epstein were directors, and Epstein an officer of Brook-side, but no question is presented whether there might be some liability on their part to Brookside at the instance of its creditors, or of its preferred stockholders who owned $400,000 in preferred shares. No intimation can be considered that Krug and Epstein caused Brookside to enter into a contract to its corporate disadvantage with Sheinman, in order that they might obtain $750,000 for their personal use. No evidence of that is in this record, nor could any such claim be made except by other stockholders or creditors of Brook-side. It certainly cannot be made by Sheinman, who was a party to the agreement. Sheinman contends, to be sure, that Krug and Epstein proffered to him this selling agency with Brookside in consideration of his advancing to them $750,000, and that his forbearance to collect this money from them was dependent upon the performance of its promises by Brookside under this agreement. The difficulty with that argument, as hereafter pointed out, is that the contract is drawn so as to provide that only Brookside is responsible for the performance of its obligations to Sheinman, with the exception of several *361 promises which Krug and Epstein guarantee that Brookside will perform, but the latter are not involved in any of these disputes. For the purposes of this proceeding, the fact is irrelevant that this $750,000 was not to go, and did not go, to Brookside, nor is it to be decided as though this money had been or was to have been advanced to Brookside.
The notice of intention to arbitrate given by Sheinman, dated July 22, 1949, calls for the adjudication by the American Arbitration Association of enumerated questions in Sheinman’s favor, which are summarized by stating that he applies to arbitrators (1) to obtain an interpretation and determination that Brookside, Krug and Epstein have breached the contract against Sheinman, or his assignee, and that, as a consequence, the latter are entitled to a recovery upon the collateral posted by Krug and Epstein as security for the $750,000 advancement, without waiting until April 16, 1951, as provided by the terms of said agreement. This paragraph of the notice, contrary to the theory that the contract has been terminated or rescinded by Sheinman or his assignee in consequence of a breach, continues by adding: “ Baybrook Textile Corporation and/or Nathan Sheinman, as their interests shall appear, are not proceeding for a determination, interpretation or award terminating the contract above referred to, unless and until the said Seven Hundred Fifty Thousand Dollars ($750,000.00) has been realized, nor do they or either of them, as their interests shall appear, elect to rescind o'r otherwise terminate the said contract, unless and until the said Seven Hundred Fifty Thousand Dollars ($750,000.00) has been realized.” The next subject for arbitration, designated (2), is to obtain an interpretation and determination that Brookside, Krug and Epstein have broken their agreement and that, as a consequence, Sheinman and his assignee have had withheld from them by Brookside commissions earned for the fiscal year from March 1,1948 to February 28, 1949 and for each monthly period thereafter commencing March 1, 1949. Sheinman’s brief indicates that under this head he is also claiming on this appeal damages from all three of the respondents, in addition to commissions alleged to have been withheld. The last subject to be arbitrated, designated (3), is to obtain an interpretation and determination that Sheinman, or his assignee, is entitled to collect all accrued and unpaid earned commissions due to them.
$97,827.76 was paid by Brookside to Sheinman in commissions to the end of February, 1949, covering all sales made through January, 1949. During March, 1949, according to *362 respondents, Brookside ascertained that it had operated under a loss for its fiscal year ending with February, 1949, and so informed Sheinman, requesting him to supply Ms figures showing Ms actual cost of performing the functions for which he was engaged. It will be recalled that under paragraph 7 of the agreement, if the profit of Brookside for any fiscal year were to be less than $600,000, one half of the deficiency was to be deducted from Sheinman’s base pay, except that, in no event, was he to receive less than the actual cost of his operations. Not having received a statement of the cost of Ms operations from Sheinman by April, 1949, Brookside paid to him an additional $17,050.38 covering commissions calculated on March, 1949 sales and repeated the request, this time by letter, that Sheinman supply his actual costs. Sheinman had a size-able sales organization, and it was an open question whether the $114,878.14 thus paid to him exceeded or fell short of his actual expenses. There is some question concerning how much was paid to Sheinman, but he, as hereafter stated, admits having received somewhat more than these figures. At the end of June, 1949, Sheinman supplied a statement showing total expenses of $180,660.10 for the period from May 17, 1948 to March 31, 1949, during which he set forth as income to him from commissions and management $146, 742.36. Epstein, acting for Brookside, questioned the amount of these expenses, contending that they represented costs of sales by Sheinman of goods produced by other mills owned by him, and that these expenses should not be allocated entirely against Brookside. Sheinman questioned Epstein’s assertion that Brookside sustained a loss of $34,000 for the fiscal year in question, referring to a letter from Epstein dated April 2, 1949, reporting a gross profit of $493,000 before adjustments of inventory values, reserves for depreciation and other items. The chief controversy over that phase appears to have been whether, under the terms of the contract, inventory adjustments were to be made before computing the amount of the net profits of Brookside in order to determine to what extent they fell short of $600,000 for the fiscal year in dispute. Brookside and Epstein assert that standard accounting practice requires a financial statement based on inventory at cost or market value, whichever is lower, and that its regularly employed accountants would not certify a financial statement upon any other basis. Sheinman contends that the contract describes the procedure to be employed in determining the net profits, and that this fails to mention inventory adjustments. No question is raised *363 concerning the valuation of the inventory items, figures for which were supplied by Sheinman’s own organization.
Whether inventory adjustments are to be considered presents a question of interpretation of the contract, which is subject to arbitration. There is also an issue for arbitration concerning the amount to be allowed for Sheinman’s expenses, in event that the net profits of Brookside fell far enough below $600,000 so as to wipe out Sheinman’s base pay (commissions of 3% on net sales of greige goods and 5% on net sales of finished goods of Brookside) over and above his cost of operations. There may be some question concerning the volume of sales actually made by Brookside. These are issues between Brook-side and Sheinman, or his assignee, that are covered under paragraphs 2 and 3 of the notice of intention to arbitrate, and are allowed to proceed to arbitration under the order of Justice Botein, which has not been appealed from in that respect.
The basic question on this appeal is whether there is anything in the contract subjecting Krug and Epstein personally to the jurisdiction of the arbitrators by reason of any facts which appear in the record. Sheinman and Raybrook contend that Krug and Epstein undertook a contractual obligation guaranteeing performance of this contract by Brookside, and if that position be not sustained, that they are liable individually for preventing performance by Brookside of its obligations under this agreement.
The arbitration clause may well be broad enough to include actionable disputes arising from breaches of Brookside’s obligations under the contract, if there be such, induced by Krug or Epstein, and it is also assumed that the arbitration clause is broad enough to allow the arbitrators to determine (if there is really an arbitrable, dispute about it) whether Sheinman has the right to declare a breach of the contract and proceed against the 4,183 shares of Brookside common posted as collateral.
On the other hand, if no facts have been shown indicating that there is a dispute between the parties, involving Krug and Epstein personally, which could become the subject of arbitration under the terms of the agreement, no arbitration of such an issue is to be had. It is true that an arbitration award is not to be set aside for mere errors of judgment, either as to the law or as to the facts (Matter of Motor Haulage Co. [Teamsters’ Union], 272 App. Div. 382), but where the facts are definite and the legal conclusions to be drawn therefrom are well established, a party is not entitled to demand an *364 arbitration in order that the law may be modified for his benefit merely because the contract contains an arbitration clause. This rule has been well stated in Matter of General Electric Co. (United Elec., Radio & Mach. Workers) (196 Misc. 143, 146): “ The law is settled that the mere assertion by a party to an agreement containing an arbitration clause, such as the one here involved, that there is a dispute as to the meaning or application of the contract is not enough to entitle it to arbitration. If the nonapplicability or the meaning of the contract is clear and free from doubt, the demand for arbitration must be denied on the ground that no bona fide issue for arbitration exists. Thus in Matter of International Assn, of Machinists (Cutler-Hammer, Inc.) (271 App. Div. 917, affd. 297 N. Y. 519), the court said (p. 918): ‘ While the contract provides for arbitration of disputes as to the 11 meaning, performance, nonperformance or application ” of its provisions, the mere assertion by a party of a meaning of a provision which is clearly contrary to the plain meaning of the words cannot make an arbitrable issue. It is for the court to determine whether the contract contains a provision for arbitration of the dispute tendered, and in the exercise of that jurisdiction the court must determine whether there is such a dispute. If the meaning of the provision of the contract sought to be arbitrated is beyond dispute, there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration. ’ ” The following cases were cited in the General Electric Co. case (supra) as having reached the same conclusion: Matter of Curry, Inc. (Reddeck) (194 Misc. 527); Matter of Towns & James (Federal Labor Union) (183 Misc. 181); Matter of Hawley (91 N. Y. S. 2d 723), and Matter of Amsterdam Dispatch v. Devery (254 App. Div. 233, affd. 278 N. Y. 688). Limitations upon the power to arbitrate of a related kind were held to exist in Matter of Kallus (Ideal Novelty & Toy Co.) (292 N. Y. 459); Matter of Stern (285 N. Y. 239), and Matter of Buffalo & Erie Ry. Co. (250 N. Y. 275).
To hold Krug and Epstein personally liable for breach of Brookside’s obligations under this agreement, would require the arbitrators to make a new contract. Under subdivision (a) of paragraph 21, for example, the contract provides that Brook-side will not do certain things, and that Krug and Epstein “ will not cause or permit the Company ” to do them; but none of the specific matters enumerated in that paragraph are involved in dispute. It is plain that when it was intended that Krug and Epstein should guarantee performance by Brook- *365 side, it was specifically so stated. Sheinman’s forbearance to collect his advancement of $750,000 for three years was clearly not made to depend upon the continued performance by Brookside of its obligations under this contract.
The main theory of Sheinman’s position, both to sustain an anticipatory breach of the contract so as to accelerate his right to sell out Krug’s and Epstein’s collateral, and to obtain a recovery against them for damages in excess of commissions that accrued on net sales actually made by Brookside, rests on decisions such as Lamb v. Cheney & Son (227 N. Y. 418) and Hornstein v. Podwits (254 N. Y. 443) holding that damages may be recovered against a person for maliciously inducing a breach of contract between other parties. Such a theory is barely discernible from the wording of any of the paragraphs in Sheinman’s notice of intention to arbitrate. It is presented in Sheinman’s opposing affidavit, verified September 14, 1949, in which he attempts to state facts indicating such conduct on the part of Krug and Epstein. Nothing whatever of that nature is stated against Krug except that Sheinman informed Krug of his grievances against Epstein, and that Krug “ promised to discuss the matter with Epstein, but apparently he never did.” The substance of Epstein’s alleged misconduct, as stated by Sheinman, is that he “ bawled out ” employees of Sheinman, interfered with and attempted to countermand instructions of Sheinman to salesmen, endeavored to arrange for others to sell the products of the Brookside mill, fixed sales prices contrary to Sheinman’s duties to style, supervise and manage production, insisted upon retaining the goods in anticipation of a better market, and attempted to supervise sales and contracts from his law office. This is all that the charges of inducing breach of contract against Krug and Epstein amount to. TJpon that factual basis, Sheinman seeks to have a board of arbitration determine that he is entitled to damages on the theory that Brookside would have made more sales than actually occurred if Epstein had refrained from doing those things, that Krug and Epstein should personally pay such damages apparently based on commissions computed on the amount of such hypothetical sales prevented by those alleged wrongful acts by Epstein, and that, as a further consequence, Sheinman should be allowed to proceed at once against Krug’s and Epstein’s collateral.
No facts have been adduced indicating that Epstein was acting as Krug’s personal agent, Epstein’s acts were not binding on Krug, and the only reason expressed for holding Krug on this theory is that he promised to discuss the matter with Epstein, *366 but apparently never did so. Special Term was clearly correct in eliminating any liability on the part of Krug individually from the subject matter of the arbitration.
So far as Epstein is concerned, in order to hold a person liable for preventing the formation or performance of a contract by another, his acts must have been malicious, at least in law. Epstein is not to be held individually for acts performed as officer or agent for Brookside, even if such acts resulted in breach of the contract by Brookside. Epstein was a director of Brookside, and although the only office which he held was that of secretary, his duties in behalf of the corporation appear to have been broad. It was he who signed the contract with Sheinman for Brookside. Sheinman was, after all, only selling agent and general supervisor of production for Brookside. He was to receive commissions on all sales by Brookside, whether effectuated by him or by others (par. 32B). Sheinman’s chief complaint against Epstein is that the latter fixed Brook-side’s selling prices so high that he was unable to make sales in the quantity which he had anticipated. Epstein asserts that Sheinman wanted the sales prices fixed so low, in order to earn added commissions, that it would have caused the mill to have operated far into the red. It is well known that, during the year in question, there was a falling market for the sale of products of textile mills. Epstein avers that Sheinman’s selling organization almost came to a standstill in obtaining orders for merchandise, and that by reason thereof it became necessary for him to seek other outlets. In order to do that, Epstein states that he had to see that the styling of goods was such as to be attractive to other outlets. No sales or orders obtained by Sheinman were rejected, and commissions were paid to Sheinman upon all the sales of the mill whether effected by bim or not. The foregoing does not seem to be seriously disputed, but whether disputed or not, this matter in difference at most presents a controversy between Sheinman or his assignee and Brookside, not Krug and Epstein. Sheinman’s complaints are based on a contention that the mill could have sold more goods at lower prices, and if Epstein had not interfered with his exercising greater managerial powers over Brookside. He claims that he should, therefore, be paid damages by Krug and Epstein personally by reason of sales that did not take place. He may have an arbitrable dispute with Brookside concerning this and, as has been stated, concerning the accounting methods to be followed in ascertaining Brookside’s net profits, and the amount of his own selling expenses, but these and other con *367 troversies with Brookside are left to be arbitrated by the order appealed from insofar as any of them come within the scope of the notice to arbitrate which was prepared and served by appellants, and these questions have no relation to any personal liability of Epstein or Krug.
Assuming that Brookside could have undertaken these contractual obligations at all, which is something that only its other stockholders or creditors but not Sheinman could question, whatever Epstein did was done as an officer and director in behalf of Brookside. If Epstein thought that the sales through Sheinman had diminished to an extent so as to render it necessary that Brookside should sell through others, having their own ideas of how its merchandise should be styled, that was a matter of business judgment for Brookside, even if it involved breaking Brookside’s contract with Sheinman. If Epstein thought that Sheinman, in the exercise of his powers of general supervision, had built up an excessive inventory of 4,000,000 yards, which Sheinman wanted to sell at a loss, and Epstein refused to allow sales below a certain price, he again exercised his judgment as representing Brookside. If he “ bawled out ” employees of Baybrook and interfered with Sheinman’s instructions to them in order to carry out policies for Brookside, these also were the acts of Brookside. There is not a suggestion that Epstein was doing any of these things in order to make a private profit for Krug and himself at the expense of Brook-side. If what he did amounted to breach of contract with Sheinman, it was a breach of Brookside’s obligations. The decisions are clear that an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation’s promise being broken (Greyhound Corp. v. Commercial Cas. Ins. Co., 259 App. Div. 317; Navarro v. Fiorita, 271 App. Div. 62, affd. 296 N. Y. 783).
To hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations.
Sheinman’s only answer to this is that Krug and Epstein are situated differently from the usual case, for the reason that they received the proceeds of Sheinman’s $750,000 advancement for their personal use. That did not make them personally *368 responsible for Brookside’s performance, nor require them to repay $750,000 upon a moment’s notice under penalty of losing their stock unless the contract said so. As above stated, other stockholders or creditors might be heard to complain if there were ground for it that Brookside promised too much to Sheinman under the contract, and did not get fair value received, in order that Epstein and Krug might have this money from Sheinman. But the other stockholders and the creditors of Brookside are not complaining. Sheinman is not in a position to complain for them. He cannot be heard to say that he has been wronged upon the ground that Krug and Epstein manipulated the corporation so as to give him an unconscionable benefit. The only way in which a personal advantage to Krug or Epstein would be relevant to the issue, in order to render their conduct toward Sheinman actionable against them as a breach of contract by Brookside (Lamb v. Cheney & Son, 227 N. Y. 418, supra), would be that they were to derive a personal gain from causing this contract to be broken. Here they were not in position to derive any gain apart from the effect on Brookside, but only loss if they acted contrary to the best interests of Brookside. "Whatever they did was an exercise of business judgment in Brookside’s behalf, and if it resulted in a breach of Brookside’s obligations under the contract, then it alone is liable. Any breach of contract by Brookside is allowed to proceed to arbitration under the order that has been appealed from.
Special Term was therefore right in ruling that items No. 2 and No. 3 of Sheinman’s notice of intention to arbitrate should be proceeded with against Brookside only, and not against the individuals Thomas Epstein and Julius A. Krug. It follows that ipso facto the matters set forth in item No. 1 should be eliminated from the arbitration, as is done by the order appealed, inasmuch as the acceleration of the time for repayment of the advancement to these men is based upon the same acts charged to them. The only theory on which repayment of the $750,000 advancement could be exacted of Krug and Epstein, ahead of the due date, is that they were guilty of inducing breach of contract by Brookside under circumstances which would render them liable as individuals. No controversy being presented upon that phase of the matter, they cannot be subjected under item No. 1 to a liability contrary to that provided for by the agreement. It may be added that even if they were personally guilty of a breach of this contract, item No. 1 would still be improper. The only theory under which Sheinman could contend that his advancement of $750,000 had become repayable *369 before the expiration of three years from the date of the agreement, would be that the agreement had been broken by Krug and Epstein, and was therefore declared by Sheinman to be terminated or rescinded. Item 1 of the notice of intention to arbitrate, is phrased in such manner as to be inconsistent with either the termination or rescission of the contract by Sheinman. It states that neither Sheinman, nor his assignee, Ray-brook Textile Corporation, is proceeding for an award terminating the contract unless and until the said $750,000 has actually been realized, and it specifically states that they did not “ elect to rescind or otherwise terminate the said contract, unless and until the said Seven Hundred Fifty Thousand Dollars ($750,000.00) has been realized.” That means that Sheinman insists upon continuing to be sole selling agent and receiving his sales commissions, while at the same time declaring an anticipatory breach on the part of Krug and Epstein so as to sell out their collateral, which the contract states can only be done after the lapse of three years. The nature of the agreement is such that Sheinman could not declare an anticipatory breach and demand the return of his money ahead of time, without simultaneously declaring the entire agreement at an end.
We think that it was not necessary to direct a trial of the preliminary issue concerning whether Sheinman’s assignee, Raybrook Textile Corporation, is subject to arbitration. Subdivision (a) of pargraph 17 of the contract provides that Sheinman shall have the right to assign the selling agency, styling and general supervision contract provided for in paragraph “ 7 ” to a corporation to be organized, subject to certain provisos, such as that Sheinman shall remain in control of the corporation, that it shall only be engaged in the business of carrying out the terms of such employment, and that Sheinman himself shall remain liable. It may well be that Krug and Epstein do not know whether Raybrook has other business, or there may be some controversy concerning whether it carries on other business for Sheinman while charging all of its expenses to Brookside. If there be any disputes of that kind, it would nevertheless, be for arbitration rather than for determination by the court. The situation might be otherwise, if petitioner-respondents were demanding arbitration of a claim by them against Raybrook. In that event, Raybrook might have a trial before the court of whether it had become bound by the contract including the arbitration clause. Here, however, Raybrook is making claim against Brookside. There can be no dispute that *370 it is subject to the provisions of the agreement, including the arbitration clause, and, before Raybrook can recover, it must establish to the satisfaction of the arbitrators that it is the qualified assignee under said agreement. Sheinman and Raybrook should both remain in as parties, inasmuch as Sheinman is liable under the terms of the agreement notwithstanding an assignment thereof, and he would be the party in interest, in any event, if the arbitrators were to determine that Ray-brook has not qualified under the terms of the agreement as assignee.
It follows that the order appealed from should be modified as above stated, and, as so modified, should be affirmed, with costs.